UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JEFFREY  STRINGER,                    )
                                      )
                    Plaintiff,        )
                                      )
        vs.                           )        1:13-cv-00659-SEB-TAB
                                      )
CAMBRIA FABSHOP --                    )
INDIANAPOLIS, LLC,                    )
                                      )
                    Defendant.        )

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant's Motion for Summary Judgment

[Docket No. 44], filed on July 25, 2014.  Plaintiff Jeffrey Stringer brings this action

against his former employer, Defendant Cambria Fabshop – Indianapolis, LLC

("Cambria"), alleging that Cambria discriminated against him because of his race

(African-American) and retaliated against him, in violation of 42 U.S.C. § 1981.[1]  Mr.

Stringer also brings a state law claim for intentional infliction of emotional distress.  For

the reasons detailed below, we <u>GRANT IN PART</u> and <u>DENY IN PART</u> Defendant's

motion.

**Factual Background**

---

[1] In his Complaint, Mr. Stringer also alleged claims for hostile work environment and intentional
infliction of emotional distress.  However, he voluntarily dismissed those claims in his response
in opposition to Cambria's motion for summary judgment.  Accordingly, Defendant's Motion for
Summary Judgment is <u>GRANTED</u> as to those claims.

**General Background**

Mr. Stringer began his employment with Cambria on September 4, 2012. Bill Goers, Plant Manager of Cambria's Indianapolis Fabshop, hired Mr. Stringer as Administrative Assistant. Mr. Stringer received $15.00 per hour plus overtime pay and reported directly to the Plant Manager. Mr. Stringer received a copy of Cambria's Employee Handbook when he began his employment. He understood that Cambria published its anti-discrimination and anti-harassment policies in the Handbook and that the Handbook outlined several avenues for reporting harassment, including: to an employee's manager; to another manager at the Indianapolis Fabshop; to the corporate Performance Management Department; or to the corporate Legal Department.

When he first began his employment, Mr. Stringer performed administrative duties related to Cambria's safety and training programs. For example, Mr. Stringer played the training videos that comprised the safety portion of Cambria's new employee orientation program and administered the applicable test to new employees following the showing of the videos. He also ensured that employees received mandatory safety equipment. New hires could not begin working on the production floor until they had completed the safety training administered by Mr. Stringer and received proper certification. Mr. Stringer had no previous safety experience or other experience training employees in a manufacturing or fabshop environment.

**Plaintiff Encounters Safety and Training Issues at the Indianapolis Fabshop**

According to Mr. Stringer, when he first began working at Cambria in September 2012, neither the managers nor the employees were following the safety and training

policies and were instead more focused on production. Stringer Dep. at 32-34. Mr. Stringer spoke with Mr. Goers about his concerns and was told that Cambria had to "get product out the door." *Id.* at 34. Mr. Stringer then discussed the matter with Cory Eccles, who was based in Minnesota and was the safety manager for all Cambria facilities. Mr. Stringer contends that Mr. Eccles told him, "you know what you need do," and further stated that he (Eccles) would hold Stringer responsible if he did not enforce Cambria's safety and training policies. *Id.* at 35. Mr. Eccles then sent an email to Indianapolis management stating that he had not been receiving paperwork for new hires in a timely fashion. *Id.* at 35-36. Upon receipt of Mr. Eccles's email, Mr. Goers spoke with Mr. Stringer and told him never to go to Mr. Eccles for anything that happened at the Indianapolis Fabshop. *Id.* at 36. Mr. Stringer testified that Megan Patton, Cambria's drawing area manager, called him a "snitch." *Id.* at 26, 37.

In October 2012, Mr. Stringer approached Mr. Goers about getting an office in the fabshop area so that he could observe the production floor for safety purposes. Mr. Goers told him that there was no space, although Mr. Stringer believed there was enough space to place another desk in one of the offices where he could see the production floor. *Id.* at 39-40. Because Mr. Stringer did not have a designated office, he had to keep employee safety files in a bag that he carried with him, or use a shack area on the truck dock to keep his files and training materials. *Id.* at 41-42. Mr. Stringer contacted Mr. Eccles and informed him of the issue. Shortly after that, Mr. Stringer contends that Mr. Goers began sending him out on deliveries to homes and businesses and that he made deliveries for the whole month of October. According to Mr. Stringer, he sometimes drove 11 or 12 hours

per day making deliveries, was required to stay in hotel rooms, and once was required to drive to Wisconsin for a delivery. Although other Cambria employees were responsible for deliveries, Mr. Stringer testified that Mr. Goers assigned the long hauls to him, which caused his safety trainings to become backed up. *Id.* at 43-46.

**Plaintiff's Training in Minnesota**

On November 1, 2012, Mr. Goers emailed Brian Scoggin, Vice President of Operations, to obtain approval to send Mr. Stringer and another Cambria employee, Brandon Grose, to Minnesota for training from November 11 through November 16, 2012. Mr. Goers recommended that Mr. Stringer receive one day of management training at Cambria University and work with Mr. Eccles on safety and training the remainder of the time. Mr. Scoggin approved Mr. Goers's request the same day. The next day, on November 2, 2012, Mr. Goers told Mr. Stringer the training dates and Stringer traveled to Minnesota as scheduled. He received safety and training instruction from Mr. Eccles on the first day, observed supervisors on the fabshop floor during the second and third days, and spent the fourth day reviewing safety and training manuals. While he was in Minnesota, Mr. Stringer also spent time with DeQuan Spencer, a Cambria employee who performed performance management (human resources) administration duties at the Minnesota fabshop. Mr. Spencer provided Mr. Stringer with guidance on interview questions, instructed him to be very detailed in his paperwork, and offered to be a resource if Mr. Stringer ever needed assistance.

**Plaintiff Becomes Performance Manager**

4

Shortly after Mr. Stringer returned from Minnesota, Cambria entrusted him with responsibility for performance management administration at the Indianapolis Fabshop. His new duties included conducting initial applicant interviews, placing advertisements for open positions, administering the Test of Adult Basic Education ("TABE"), and partnering with Area Owners (managers) to coordinate employee discipline policies and other employee issues. Mr. Stringer had no authority, however, to hire, fire, or discipline employees, but could recommend discipline for employees and managers. Mr. Stringer had no prior experience working in human resources.

Mr. Scoggin told Mr. Stringer that he wanted Stringer to bring change to the front office and "light a spark" under the employees at the Indianapolis Fabshop. Stringer Dep. at 79. Mr. Scoggin also told Mr. Stringer that he would be given an office. According to Mr. Stringer, the office he received was originally supposed to go to Barbara Kamminga, the receptionist at the time. Mr. Stringer contends that his co-workers were angry that he had been given the office and started making comments that he had stolen Ms. Kamminga's furniture. Mr. Stringer noticed that his office was the only one that was not being cleaned and that there were always files and paperwork all over his chair and floor each morning. *Id.* at 79-82. When he asked Anna Ferguson, the office manager, about this, she said that she placed the paperwork in his office and "maybe it would just slide off" his desk. *Id.* 27, 85.

Mr. Stringer testified that he was subjected to other comments from unnamed co-workers, including that he was a "suck up", a "goody boy they put in the front", and that he was "kissing Brian Scoggins' ass." *Id.* at 86. Ms. Ferguson also told him, "[w]e don't

want you all up here." *Id.* Rex Nelson, a sales manager, made comments such as: "This is the hood up in here now. This is the hood up in this piece." *Id.* at 27, 88. Mr. Nelson also greeted Mr. Stringer by saying, "yo, yo, homie." *Id.* 89. Mr. Stringer never told any of his supervisors about these comments, however. *Id.* at 87.

**Defendant's New Plant Manager**

Around the same time that Mr. Stringer became the performance manager, Mike Quattlebaum replaced Mr. Goers as Plant Manager of the Indianapolis Fabshop and became Mr. Stringer's new supervisor. Mr. Goers transferred into the position of Regional Account Representative. As a Regional Account Representative, Mr. Goers was not supervised by the Plant Manager but instead reported to the Business Services Division.

As the new Plant Manager, Mr. Quattlebaum oversaw the Indianapolis Fabshop's day-to-day operations and made final decisions regarding employee discipline, hiring, and firing. At Cambria, Plan Managers are also responsible for establishing the pay rate for new fabshop employees, but may not unilaterally increase an employee's pay rate. They may recommend a pay increase for a particular employee, but Mr. Scoggin is the ultimate decisionmaker.

**Plaintiff's Interactions with Employees**

On December 5, 2012, shortly after he arrived in Indianapolis and took over as Plant Manager, Mr. Quattlebaum ordered a new computer and private printer for Mr. Stringer's office so that Stringer could have privacy to conduct necessary performance management duties. That evening, Mr. Stringer reported to the Indianapolis Fabshop

during second shift to observe employee behavior and observed an employee eating pizza in a manager's office and looking at confidential files.[2]  Mr. Stringer told the employee to leave the office and, after initially refusing, the employee left after a "small verbal confrontation" with Mr. Stringer.  Stringer Dep. Exh. 12.

The next morning, Mr. Stringer attended an operations meeting with Mr. Goers, Mr. Nelson, Ricky Hughes, Ben Schoonover, Matt Ross, Joe Smith, Brandon Grose, and Lindsay Fellers.[3]  The morning operations meetings occurred daily, the purposes of which were to ensure the schedule was in the right order, that jobs were being produced in the right order, and to address any issues from the previous day.  During the meeting, Mr. Hughes, Production Manager, told Mr. Stringer to mind his own business, to refrain from talking to Hughes's employees, and that he (Stringer) had no right to lock up the office.  Mr. Hughes raised his voice, but did not make any racially derogatory or inappropriate remarks.

Mr. Stringer responded to Mr. Hughes, stating, "None of you people in here are willing to come in here at 9:30 and try to handle the situations.  But when I do, you guys want to jump on my ass about it."  Stringer Dep. at 135-36.  Mr. Nelson, Regional Account Representative, then stated, "Why don't you fucking listen?  Why don't you stop acting like the fucking Cambria Police, Jeffrey [Stringer]?  You are nobody here.

---

[2] In his deposition, Mr. Stringer testified that the employee was looking at files.  However, he omitted this fact in the report he prepared the morning after the incident, stating only that he caught the employee eating pizza in a manager's office.

[3] Ms. Fellers got married during her employment at Cambria.  Her name was Lindsay Smith throughout Mr. Stringer's employment.

You need to fucking listen and stop acting like you own everything." *Id.* at 136. Mr. Stringer attempted to interrupt Mr. Nelson, but Nelson slammed his hand down on the table and said, "You need to shut up and listen sometimes. You're nobody's boss." *Id.* Ms. Fellers testified that Mr. Nelson's behavior made her very uncomfortable in that it seemed to be a lot of hostility directed at Mr. Stringer for no reason. Fellers Dep. at 26-27. Mr. Stringer then asked to be excused from the meeting. Mr. Goers denied Mr. Stringer's request and told him to "sit there and take it" and to "let Rex [Nelson] vent." Stringer Dep. at 136-37.

After the meeting concluded, Mr. Goers met separately with Mr. Stringer and Mr. Nelson, advising them of the need for everyone to work as a team. Mr. Nelson stated that he did not have a problem with Mr. Stringer, but that Stringer needed "to fucking listen and stop acting like you own everybody's department." Stringer Dep. at 137. Mr. Nelson apologized to Mr. Stringer for raising his voice and they shook hands to end the meeting.

That same day, Mr. Stringer prepared a document he titled "Cambria Disciplinary Form." On the form, Mr. Stringer detailed the incident with Mr. Nelson, omitting Mr. Nelson's alleged use of curse words, his apology, and the subsequent meeting during which Nelson and Stringer shook hands. Although Mr. Stringer had no authority to discipline employees, he recommended that Cambria issue Mr. Nelson a written warning. According to Mr. Stringer, he provided the document to Mr. Goers "maybe that Monday of the next week. I don't know when I gave it to him." Stringer Dep. at 197. Mr. Stringer testified that Mr. Goers responded, "We don't air out our dirty laundry to

8

corporate." *Id.* at 142. Cambria, however, contends that it has no record of any of its employees receiving the form. Mr. Stringer testified that he did not provide a copy of the document to anyone at Cambria's corporate office.

**Plaintiff Receives Racially Offensive Note**

In mid-December 2012, Mr. Stringer requested approval from Mr. Quattlebaum to place a note on employee vehicles instructing them to park in a certain fashion. Mr. Quattlebaum told him "do it if you want to." Stringer Dep. at 116. Mr. Stringer prepared the parking lot note and Mr. Quattlebaum approved it. Over the next few days, on approximately five occasions, Mr. Stringer placed copies of the note on improperly parked employee vehicles.

At some point not long after he had place the parking lot note on employee vehicles, Mr. Stringer found a copy of the note on his vehicle one evening at 7:00 or 8:00 p.m. with the following handwritten message: "Fuck You Nigger!" Stringer Dep. Exh. 5. Mr. Stringer had no thoughts as to who might have left the note with the racial slur. Another Indianapolis Fabshop employee, Lori Jasper, told Mr. Stringer that other employees were calling him "uppity," "Uncle Tom," "black guy," and "the 'N' word." Stringer Dep. at 119-120.

Mr. Stringer testified that he informed a manager, Brandon Grose, about the note. *Id.* at 119. According to Mr. Stringer, after the management meeting the following day, he also told Mr. Quattlebaum about the note he had received but did not show Quattlebaum a copy of the note because he did not trust him (Quattlebaum) and wanted to keep the note for himself. Mr. Stringer testified that he wanted Mr. Quattlebaum to

come to his office and request to see the note.  Mr. Quattlebaum told Mr. Stringer he would investigate, but Quattlebaum never told Mr. Scoggin, Mr. Spencer, or anyone in Cambria's corporate performance management or legal department about the note with the racial slur.  Mr. Stringer testified that he kept the physical copy of the note to himself because he "wanted Mike [Quattlebaum] to handle the situation because I didn't know if he could do it or not.  I just wanted to see."  Stringer Dep. at 140.

According to Mr. Quattlebaum, however, Mr. Stringer never told him about the note with the racial slur and he had no knowledge of its existence at any time while he was employed at the Indianapolis Fabshop.  Mr. Quattlebaum did learn that someone had defaced the original parking lot note by writing "WTF" and "LOL" on a copy and posting it in the lunchroom.  He addressed the issue at an all-company meeting, stating that such behavior was unacceptable and would not be tolerated by Cambria.

**Defendant Denies Plaintiff's Request for a Wage Increase**

Cambria uses Payroll Action Forms to notify the corporate office of changes in an employee's information, including changes in position and wages.  After Mr. Stringer became performance manager, his payroll action form was never updated to reflect the change in his position or a wage increase, despite the fact that he was performing his performance management responsibilities in addition to his safety and training duties. Quattlebaum Dep. at 38-39.  Because Mr. Stringer was aware that other Cambria facilities had two people designated to perform the duties he was performing alone (for example, at the Minnesota Fabshop, Mr. Spencer was the performance manager and Mr.

Eccles was responsible for safety and training[4]), he approached Mr. Quattlebaum on December 20, 2012 to request a wage increase that would reflect his increased duties. Stringer Dep. at 104 and Exh. 14 at 1.

Mr. Stringer testified that Mr. Quattlebaum said he would look into a raise, but subsequently told Stringer that he had to deny the raise because Cambria was at that time revising its compensation program. Stringer Dep. at 105. However, according to Mr. Stringer, another Cambria employee, Brandon Grose, had recently been promoted and given a salary increase. *Id.* at 107. Mr. Quattlebaum testified that he was not aware that Cambria had ever considered a raise for Mr. Stringer and Cambria contends that it had no knowledge of Mr. Stringer ever requesting a wage increase. Quattlebaum Dep. at 42; Def.'s Ans. to Interrog. No. 18).

**Plaintiff's Termination**

On Thursday, December 27, 2012, Donna Weiler started working at Cambria's Indianapolis Fabshop as a receptionist. On her second day at work, on December 28, 2012, Ms. Weiler and Brandon Jones, another new employee, met with Mr. Stringer for training on safety issues. During that meeting, Mr. Stringer instructed Ms. Weiler to staple printouts he needed for another meeting. He also told Ms. Weiler and Mr. Jones that they would not start work unless he said it was okay and that he controlled everything they did. Ms. Weiler then spent the rest of the day training with Barbara

---

[4] Additionally, Mr. Eccles was given a different title than "Administrative Assistant," which was Mr. Stringer's designation.

Kamminga and told Ms. Kamminga that she would not have accepted the job if she had interviewed with Mr. Stringer.

Around 1:00 p.m. on Monday, December 31, 2012, Mr. Stringer returned to his office from outside, where it had been snowing. Ms. Weiler was standing in the doorway to Ms. Kamminga's office laughing and commented that Mr. Stringer looked like a "black snowman," which made everyone laugh. According to Mr. Stringer, he responded, "Oh really?" He then "ran up to" Ms. Weiler, jokingly put his arms around her back with his arms extended so that there was no body contact, and shook snow from his body onto hers. Stringer Dep. at 153-54, 156. Mr. Stringer also testified that because it was New Year's Eve, a number of Cambria employees that day were laughing, hugging, and saying, "Happy New Year." *Id.* at 160. Ms. Weiler described the conduct as follows: "Jeffrey grabbed both of my forearms in each of his hands and then pushed his chest forcefully up against my chest. He then rubbed his chest all over mine. Stopped and then reversed direction and rubbed hard some more." Quattlebaum Dep. Exh. 19. Mr. Stringer then stated, "Welcome to Cambria," and walked into his office. Mr. Stringer asserts that he and Ms. Weiler were both laughing about the snow and that Ms. Weiler subsequently entered his office and they discussed Notre Dame and Ohio State football. Although Ms. Weiler confirmed that this conversation occurred, she stated that it took place her second day of work, Friday, December 28.

According to Ms. Weiler, she then returned to her desk and placed labels on folders at Mr. Stringer's direction. After Mr. Stringer left for the day, Ms. Weiler asked Ms. Kamminga whether Mr. Stringer's actions were normal or funny. Ms. Weiler also

requested that Ms. Kamminga email Anna Ferguson, Cambria's Office Manager. Around 4:30 p.m. that day, Ms. Weiler asked Rex Nelson for a man's opinion about whether Mr. Stringer's conduct was acceptable. Ms. Weiler told Mr. Nelson that Mr. Stringer had hugged her chest to chest. Mr. Nelson instructed Ms. Weiler to discuss the incident with her supervisor and to report the incident to Mr. Quattlebaum if she believed that Mr. Stringer's conduct was inappropriate and also stated that, based on Ms. Weiler's description of the incident, he would agree that Mr. Stringer's conduct seemed out of line. Immediately after speaking with Ms. Weiler, Mr. Nelson contacted Mr. Quattlebaum by telephone and recounted Ms. Weiler's version of the incident.

Mr. Quattlebaum was traveling when he received Mr. Nelson's telephone call, but he returned to the Indianapolis Fabshop on January 3, 2013, and immediately investigated Ms. Weiler's complaint. Mr. Quattlebaum asked Mr. Nelson, Ms. Kamminga (the only witness to the interaction between Mr. Stringer and Ms. Weiler), and Mr. Stringer to provide written statements. In her statement, Ms. Kamminga reported that Mr. Stringer had hugged Ms. Weiler and that Ms. Weiler had reacted with nervous laughter.

Mr. Quattlebaum informed Mr. Stringer that a complaint had been filed against him and asked whether Stringer had hugged Ms. Weiler. Mr. Stringer responded that he had not hugged Ms. Weiler, but that he "ran up on her and put my arms around her back and dumped some snow on her from my sweater and my hair and my shoulders." Stringer Dep. at 160. Mr. Stringer denied that his conduct was inappropriate and asked how his behavior could be a problem if Ms. Weiler was subsequently in his office joking around. *Id.* at 160-61. Mr. Quattlebaum instructed Mr. Stringer to return to his office

13

and prepare a written statement or response and informed Mr. Stringer that he was going to call "corporate."  Quattlebaum Dep. at 82.  Mr. Quattlebaum did not follow up to ask whether any Cambria employee had seen Ms. Weiler joking with Mr. Stringer after the incident.  *Id.* at 94-95.

While he waited for the written statements, Mr. Quattlebaum spoke with Ms. Weiler who reiterated that on December 31, 2012, Mr. Stringer had come inside with snow on his shirt, approached her, and gave her a hug that she felt was inappropriate. Ms. Weiler also provided Mr. Quattlebaum with a written statement detailing the December 31 incident as well as the prior interactions she had had with Mr. Stringer.  In addition to the hugging incident, Ms. Weiler included in her statement complaints about Mr. Stringer "dissing" Notre Dame; Mr. Stringer boasting in her orientation about how important he was; and Mr. Stringer having shared or taken some of another employee's French fries.  Exh. 19.  Mr. Quattlebaum then collected and reviewed the written statements prepared by Mr. Nelson, Ms. Kamminga, and Mr. Stringer.

According to Cambria, following his review of the statements, Mr. Quattlebaum terminated Mr. Stringer's employment based on the information contained therein as well as the facts he had gathered from personal interviews.  Mr. Quattlebaum concluded that Mr. Stringer had made physical contact with the new employee that had made the employee very uncomfortable.  A little over one hour after Mr. Quattlebaum first interviewed Mr. Stringer about Ms. Weiler's complaint, Mr. Quattlebaum and Mr. Nelson came to Mr. Stringer's office and told him he was being terminated.  Mr. Stringer told Mr. Quattlebaum that he could not understand how he could be fired when other

14

employees' disciplinary issues were "swept under the rug." Stringer Dep. at 163. Mr. Quattlebaum responded that the order to terminate Mr. Stringer came from corporate, although all parties agree that the final termination decision was made by Mr. Quattlebaum. Mr. Stringer had no other disciplinary issues while employed at Cambria. Quattlebaum Dep. at 90.

### Defendant's Replacement for Plaintiff

On February 25, 2013, Cambria hired Kari Nelson, Mr. Nelson's sister, to perform the duties previously performed by Mr. Stringer. Ms. Nelson was interviewed approximately one week after Mr. Stringer was terminated. Her payroll action form lists her title as PMD ("Performance Management Department") Administrator. Ms. Nelson's staring hourly wage was $19.00 and she was given a raise to $22.00 per hour on November 10, 2013.

### Other Employees' Behavior

#### Lori Jasper and Cambria Management

While Mr. Stringer was still employed at Cambria, an hourly employee, Lori Jasper, was suspended for missing work the day after a management gathering. Mr. Stringer heard that she had been very drunk at the gathering and contacted her after she did not show up for work the next day. When Ms. Jasper returned to work, she told Mr. Stringer that she had been out drinking with the corporate management team and some managers from the Indianapolis Fabshop, that the managers were buying her drinks on the company credit card, and that she had gotten drunk and ended up sleeping in one of the corporate manager's hotel rooms. She reported that some of the managers had

15

spoken to her in a sexual manner throughout the evening and she stated that she did not believe she was the only one who should have been disciplined. Stringer Dep. at 144-46.

Mr. Stringer approached Mr. Quattlebaum to discuss the issue and learned that Quattlebaum had attended the gathering as well. Mr. Quattlebaum told Mr. Stringer that he had seen Ms. Jasper come into the gathering but that he did not know what to say. Mr. Stringer voiced his opinion that the corporate and local managers who had bought Ms. Jasper drinks should have been disciplined. Mr. Quattlebaum told Mr. Stringer, "We're going to keep it quiet for now." Stringer Dep. at 147, 152. On December 17, 2012, Mr. Stringer prepared a disciplinary form addressing the incident, but did not give it to anyone at Cambria. Mr. Quattlebaum testified that he did not feel there was anything to investigate with regard to this incident and acknowledged that he may have told Mr. Stringer that. Quattlebaum Dep. at 60-61.

**Ben Schoonover**

Ben Schoonover was hired at Cambria on June 3, 2008, and was a manager at the time Mr. Stringer was hired. At the time Mr. Quattlebaum became the plant manager, Mr. Schoonover was the manager of the waterjet and saw departments. However, by December 31, 2012, Mr. Schoonover had been demoted from management because of performance and behavioral issues and a lack of leadership ability. Quattlebaum Dep. at 67-68. Other employees also complained that Mr. Schoonover's yelled and cursed at them. Stringer Dep. at 176. However, despite these issues, Mr. Schoonover's file contained only one warning report from 2008, his first year on the job. Even with his

demotion, Mr. Schoonover was still considered a supervisor. Pickler Aff. ¶ 4; Fellers

Dep. at 50-51; Quattlebaum Dep. at 105-106.

Mr. Schoonover had a reputation for being a "goofball." Fellers Dep. at 31. On

December 31, 2012, Krystle Picker pointed an air hose at Mr. Schoonover in a joking

manner. She then placed the air hose down and proceeded to walk away to return to her

department. As she walked away, Mr. Schoonover picked up the water hose and sprayed

Ms. Picker's backside, soaking her pants from her waist to her ankles. Ms. Picker then

had to walk through the plant while other employees laughed at her. Ms. Picker reported

the incident to her supervisor, Lindsay Feller, and testified that she was "extremely upset

and embarrassed" because the water made her underwear clearly visible. Picker Aff. ¶¶

2, 5, 7-10.

Ms. Fellers telephoned Mr. Quattlebaum to inform him of the incident. As noted

above, Mr. Quattlebaum was travelling on December 31, 2012, and thus, their

conversation was short. Ms. Fellers then approached Mr. Schoonover to ask him what he

had been thinking. Mr. Schoonover told her to "shut the fuck up" in front of Joe Smith,

who had taken over Mr. Schoonover's position after his demotion. Fellers Dep. at 31, 42.

Ms. Fellers and Mr. Smith discussed with Mr. Schoonover the possibility of a sexual

harassment issue because of his actions. *Id.* at 42-43. Mr. Schoonover continued to state

that it was "no big deal" and that it was only water. *Id.* at 43, 45-46. After discussing the

issue, Mr. Smith and Ms. Fellers told Mr. Schoonover that his job was on the line. *Id.* at

43-44, 46. Ms. Fellers testified that she initially believed Mr. Schoonover should have

been terminated because of his attitude, the fact that he was a manager, had been

demoted, and should have known better than to spray another employee with a water hose. Fellers Aff. ¶¶ 32-34.

Ms. Fellers called Mr. Stringer to inform him of the incident. Mr. Stringer took notes and prepared a disciplinary form. Mr. Stringer then called Mr. Quattlebuam to update him on the situation. On January 2, 2013, Mr. Stringer sent Mr. Quattlebaum an email stating that he would take statements and have all of the information ready for Quattlebaum to review when he returned to the office. Mr. Quattlebaum did not reply. The next day, on January 3, 2013 (the day Mr. Stringer was terminated), Mr. Stringer sent another email to Mr. Quattlebaum to ask how Quattlebaum wanted the disciplinary form processed, but again received no reply. Stringer Dep. at 69-72. After the manager's meeting that morning, Mr. Stringer gave Mr. Quattlebaum a file including the disciplinary form, photos, and statements from those involved. Mr. Quattlebaum conducted no investigation into the matter, but did approve a one-day suspension without pay for Mr. Schoonover. Mr. Quattlebaum also spoke with Mr. Schoonover and expressed his frustration with Schoonover's conduct. Quattlebaum Dep. at 74-75. Although reports of disciplinary action are supposed to be placed into an employee's file, there is no documentation of the water hose incident in Mr. Schoonover's file. *Id.* at 66-67.

Mr. Schoonover received three pay raises between April 29, 2012 and April 28, 2013, including one raise approximately four months after Mr. Stringer's termination. Mr. Schoonover has since left Cambria for another job, but remains eligible for rehire. Quattlebaum Dep. at 80.

18

**Brandon Steeno**

On December 18, 2013, Cambria employee Lupita Mercado complained about inappropriate comments made to her by Brandon Steeno, a supervisor. Mr. Steeno had reported to Mr. Quattlebaum until December 10, 2013, at which point he began reporting to the new plant manager, Chad Skelton.

Ms. Mercado complained that Mr. Steeno had stated, "If you weren't engaged and I weren't married, I would kiss you right now." Steeno Personnel File Documents at 4-6. Ms. Mercado also reported that a short time before this comment, while she was at a bar with other employees, Mr. Steeno had approached her, gotten very close and put his arms on her side and pulled her close, rubbed her waist up and down, and later glared at her while she was dancing. *Id.* Kari Nelson investigated the complaint and she and Mr. Skelton called Mr. Scoggin to inform him of the incident. Mr. Steeno was ultimately given a three-day suspension. *Id.*at 3-9.

**The Instant Litigation**

Mr. Stringer filed his Complaint on April 23, 2013, alleging claims for race discrimination and hostile work environment in violation of § 1981 and a state law claim for intentional infliction of emotional distress. Cambria filed its motion for summary judgment on July 25, 2014, which is now fully briefed. Mr. Stringer has since voluntarily dropped his hostile work environment and intentional infliction of emotional distress claims.

<u>**Legal Analysis**</u>

**I.      Standard of Review**

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of

the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993).

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available. *Seener v. Northcentral Technical Coll.*, 113 F.3d 750, 757 (7th Cir. 1997); *Wohl v. Spectrum Mfg., Inc.*, 94 F.3d 353, 354 (7th Cir. 1996). To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination. However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is

no genuine dispute as to the material facts. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997).

## II. Discussion

Currently before us are Mr. Stringer's race discrimination, retaliation, and disparate pay claims brought pursuant to § 1981, which provides in pertinent part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts … as is enjoyed by white citizens …." 42 U.S.C. § 1981(a).[5]  A plaintiff may use either the direct or the indirect method to prove discrimination under §1981.  *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014).  Mr. Stringer has elected to proceed under both methods here.

"Under the direct method of proof, the plaintiff makes [his] case by pointing to evidence directly showing that [his] employer subjected [him] to an adverse employment action on an impermissible discriminatory basis…."  *Id.* (citations omitted).  A plaintiff can make such a showing under the direct method using "any evidence he can muster to show that discrimination was the reason for the adverse action."  *Hester v. Ind. State Dep't of Health*, 726 F.3d 942, 947 (7th Cir. 2013).  Here, Mr. Stringer has no direct evidence of racial animus, such as an "outright confession of discriminatory intent."  *Id.* However, he can still prevail under the direct method using circumstantial evidence, such as "suspicious timing, ambiguous statements or behavior directed at others in the

_____

[5] Section 1981 defines making and enforcing contracts to mean "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).

protected group; and evidence that similarly situated employees outside the protected class were treated more favorably." *Id.* (citing *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 675, 678 (7th Cir. 2012)). A plaintiff is not required to produce evidence in each of these categories to survive summary judgment under the direct method, but rather simply must "assemble from various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action…." *Morgan v. SVT, LLC*, 724 F.3d 990, 996 (7th Cir. 2013).

The indirect method employs a burden-shifting approach first set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Morgan*, 724 F.3d at 996. To prevail using the indirect method, a plaintiff must first set forth a *prima facie* case of discrimination by establishing that: (1) he is a member of a protected class; (2) he met his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably. *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012). If the plaintiff makes this showing, the burden shifts to the employer to present a non-discriminatory reason for the adverse employment action. *Id.* Once the employee does so, the burden then shifts back to the plaintiff "to present evidence that, if believed by the trier of fact, would show that the real explanation for the action is discrimination." *Morgan*, 724 F.3d at 996.

### A. Disparate Pay Claim

Mr. Stringer alleges race discrimination under § 1981 based on Cambria's denial of his request for a pay raise and the fact that Cambria paid him a lower hourly wage than

his replacement, Kari Nelson. Mr. Stringer relies on the same evidence to support his disparate pay claim under both the direct and indirect methods of proof, to wit, that a similarly situated employee (Ms. Nelson) was paid more than him and the inconsistent explanations Cambria has given for the denial of his pay raise request. For the following reasons, this evidence is insufficient to survive summary judgment under either method of proof.

A similarly situated individual in the disparate pay context is someone who "(1) held the same job description; (ii) [was] subject to the same standards; (iii) [was] subordinate to the same supervisor; and (iv) had comparable experience, education, and other qualifications – provided the employer considered these latter factors in making the personnel decision." *Warren v. Solo Cup Co.*, 516 F.3d 627, 631 (7th Cir. 2008) (internal quotation marks and citation omitted). Here, both Mr. Stringer and Ms. Nelson were performance managers at the Indy Fabshop. Ms. Nelson was hired to perform Mr. Stringer's job after his termination and she was subject to the same standards as Mr. Stringer had been when he held the position. Like Mr. Stringer, Ms. Nelson was supervised by Mr. Quattlebaum. Mr. Stringer was paid $15.00 per hour even after he became the performance manager and acquired additional responsibilities. Ms. Nelson was hired at $19.00 per hour, which was increased approximately nine months later to $22.00 per hour.

Despite these similarities, Mr. Stringer's disparate pay claim cannot survive summary judgment because he has failed to establish that his experience and qualifications were sufficiently similar to Ms. Nelson's such that she can be considered a

suitable comparator.  For example, Mr. Stringer had a Bachelor of Arts degree in sociology and an associate's degree in criminal justice.  When he was hired, he possessed previous training experience, but that experience was not in the area of safety training nor was it in a manufacturing or fabshop environment.  Stringer Dep. at 41-42.  Additionally, Mr. Stringer testified that at the time Cambria assigned him responsibility for the administrative duties related to performance management, he possessed no previous experience in human resources.[6]  At the time she was hired, on the other hand, Ms. Nelson possessed a Bachelor of Arts degree in business administration as well as nearly ten years of relevant training experience, including work in a manufacturing environment and prior performance of both safety-related and human resources duties.  Quattlebaum Decl. ¶ 6 and Exh. 1.

In addition to the differences in qualifications and experience, Mr. Stringer has also not disputed Cambria's representation that it did not hire Ms. Nelson solely to replace him, but that she also assumed the performance management related duties that another employer performed during Mr. Stringer's employment.  Moreover, upon Ms. Nelson's hire, she directly supervised two Cambria employees.  Conversely, Mr. Stringer did not have any employees who reported to him.

---

[6] In his response brief, Mr. Stringer argues without citation to any record evidence that he had human resources experience at his prior jobs with Hubler Automotive Group and Greyhound Lines, LLC.  However, this contravenes his deposition testimony regarding his prior experience. Stringer Dep. at 41-42 (testifying that he had no human resources experience or experience conducting safety training prior to working at Cambria).  Mr. Stringer cannot create a question of fact by contradicting his own sworn testimony.  *See Holloway v. Del. Cnty. Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012) ("[A] party cannot 'create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony.'") (quoting *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir. 1996)).

Thus, the uncontroverted evidence establishes that Ms. Nelson possessed prior relevant experience that Mr. Stringer did not have, either at the point when he was hired or when he was given additional responsibilities. Additionally, unlike Mr. Stringer, Ms. Nelson took on the performance management responsibilities of another employee and also supervised two employees upon her hire. There is no dispute that Cambria took these differences into account when deciding to hire Ms. Nelson and determine her pay rate. For these reasons, Ms. Nelson is not a proper comparator. *See Warren*, 516 F.3d at 631 (finding comparator not similarly situated because employer took material differences in education, experience, and relevant skills into consideration when deciding to pay higher hourly rate). Accordingly, Cambria's decision to pay her at a higher hourly rate is not evidence of discrimination.

Because Mr. Stringer has failed to establish that Ms. Nelson is an appropriate comparator, his disparate pay claim fails under the indirect method as he has not identified a similarly situated individual who was treated more favorably, and thus has not established a *prima facie* case of discrimination. That failure does not necessarily doom his claim under the direct method of proof, however, if he is able to muster other circumstantial evidence sufficient to convince the trier of fact that it is more likely than not that discrimination was the real reason for the pay differential.

Here, the only other evidence Mr. Stringer cites in support of his disparate pay claim is his belief that Cambria has given inconsistent reasons for denying his request for a raise, which he contends is evidence of discrimination. Mr. Stringer testified that he requested a wage increase in December 2012, approximately three and a half months

after being hired.  At that point, he had taken on the performance manager duties and thus was performing those responsibilities in addition to his duties as safety and training coordinator.  Mr. Quattlebaum told Mr. Stringer that the denial of his request for a raise was because Cambria was in the midst of a review of the payment structure.  However, Mr. Stringer contends that another employee, Brandon Grose, had just been given a raise. Additionally, in its interrogatory answers, Cambria stated that it was unaware that Mr. Stringer had made a request for a raise.  According to Mr. Stringer, a jury could infer discrimination based on the inconsistent reasons proffered by Cambria for the denial of his request for a raise.  Mr. Stringer argues that a jury could infer that Mr. Quattlebaum failed to bring the matter to Cambria's attention and lied about it to Mr. Stringer.

We are not persuaded by this argument.  Initially, we note that Mr. Quattlebaum testified that he never considered a raise for Mr. Stringer, which is consistent with Cambria's interrogatory answers.  Mr. Stringer's only evidence that he did in fact request a raise is his own deposition testimony.  While such evidence is sufficient to raise an issue of fact regarding whether Mr. Stringer made a request for a raise, it does not establish that Cambria has offered shifting or contradictory explanations for its actions.

Even assuming, as we are required to do at this stage of the litigation, that Mr. Stringer requested a raise from Mr. Quattlebaum and was told it was denied because the company was revising its pay structure "for the employees that we want to keep here," this does not raise an inference of discrimination.  Stringer Dep. at 105.  Mr. Stringer conceded in his deposition testimony that he was aware that the company was in the process of revising its compensation structure at the time he requested his raise.  *Id.* at

107. Although he contends that Mr. Grose, an employee with less seniority and fewer job responsibilities received a raise during this same time period, which he argues casts doubt on Mr. Quattlebaum's explanation, it is unclear how Mr. Stringer knows this information and, even if true, he has failed to present sufficient evidence for us to determine whether Mr. Grose is a suitable comparator.

Therefore, the evidence adduced by Mr. Stringer is insufficient to establish discrimination both the direct and indirect methods of proof. Accordingly, Mr. Stringer's disparate pay claim cannot survive summary judgment.

### B.      Discriminatory Termination

Mr. Stringer also contends that he was terminated because of his race in violation of § 1981. Mr. Stringer has elected to proceed under both the direct and indirect methods of proof. We turn first to address his arguments under the indirect method.

Cambria does not dispute that Mr. Stringer can establish the first and third prongs of the *prima facie* case, to wit, that he is a member of a protected class and that he suffered an adverse employment action. Accordingly, our analysis under the indirect method is limited to the second and fourth prongs: whether Mr. Stringer was meeting Cambria's legitimate job expectations and whether similarly situated non-African American employees were treated more favorably. Here, Mr. Stringer contends that Cambria applied its employment expectations in a discriminatory manner by treating non-African American employees who violated such expectations less harshly. In such cases, the Seventh Circuit has found that if the plaintiff is able to produce "evidence sufficient to raise an inference that an employer applied its legitimate expectations in a

disparate manner …, the second and fourth prongs merge – allowing plaintiffs to stave off summary judgment for the time being, and proceed to the pretext inquiry." *Elkhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827, 831 (7th Cir. 2007) (quoting *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002)). Thus, we first address whether Mr. Stringer has presented sufficient evidence from which to conclude that there were similarly-situated employees outside the protected class who were treated differently.

To show that another employee is similarly situated, Mr. Stringer must establish that "there is someone who is directly comparable to [him] in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (citations omitted). This includes assessing "whether the employees 'dealt with the same supervisor' and were 'subject to the same standards.'" *Id.* (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000)). In cases like this one before us, where the discrimination complained of concerns discipline or discharge, a plaintiff must show that another employee who was similarly situated to the plaintiff "with respect to performance, qualifications, and conduct" was treated differently. *Peele*, 288 F.3d at 330 (citing *Radue*, 219 F.3d at 617). Generally, this means that the plaintiff must show that the two employees "had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." 219 F.3d at 618.

Here, Mr. Stringer identifies Ben Schoonover as a similarly situated white employee who engaged in similar conduct and yet received more lenient discipline. Cambria does not dispute that Mr. Schoonover and Mr. Stringer both dealt with the same

supervisor (Mr. Quattlebaum) and were subject to the same standards and employment policies, including Cambria's policy on offensive behavior and harassment. However, Cambria contends that Mr. Schoonover and Mr. Stringer are nonetheless not proper comparators because their respective conduct was not "of comparable seriousness." *E.g.*, *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 689 (7th Cir. 2007) ("[I]n deciding whether two employees have engaged in similar misconduct, the critical question is whether they have engaged in conduct of comparable seriousness.") (citations omitted).

Cambria argues that Mr. Stringer's conduct was more egregious because the employee he hugged, Ms. Weiler, had started work only three days before and was thus not familiar with Mr. Stringer, she made a formal complaint about the conduct, and it involved physical touching. Cambria contends that Mr. Schoonover's behavior, on the other hand, namely, spraying a female employee with a hose until her pants and underwear were soaking wet, was merely the result of horseplay that got out of hand between two employees who were friends and who were both involved in escalating the situation. We are not persuaded that Mr. Stringer's and Mr. Schoonover's conduct can be distinguished as easily as Cambria believes, however.

Under Seventh Circuit law, "[c]omparable seriousness may be shown by pointing to a violation of the same company rule … or to conduct of similar nature." *Id.* (internal citations omitted). Here, both Mr. Stringer and Mr. Schoonover were disciplined under the same policy, to wit, Cambria's Offensive Behavior/Harassment police. Mr. Schoonover's conduct, like Mr. Stringer's, caused a female employee to feel

30

uncomfortable and to report the conduct to her supervisor.[7]  Although Cambria attempts

to distinguish between their conduct by describing Mr. Schoonover's spraying of Ms.

Picker with the water hose as mere "horseplay" between two "goofball" employees, the

evidence adduced clearly establishes that Ms. Picker did not view her interaction with

Mr. Schoonover as such.  Like Ms. Weiler, Ms. Picker immediately reported the incident

to her supervisor, Ms. Fellers, who observed that Ms. Picker was "visibly upset."  Fellers

Aff. ¶ 18.  Ms. Fellers called Mr. Quattlebaum to inform him of the incident and then

spoke with Mr. Schnoonover, inquiring as to what he was thinking by spraying Ms.

Picker with the hose.  In response, Mr. Schnoonover allegedly told Ms. Fellers to "shut

the fuck up" in front of other managers.  Fellers Aff. ¶ 21; Fellers Dep. at 42.

Comparators need only to have "engaged in similar – not identical – conduct to

qualify as similarly situated."  *Coleman v. Donahoe*, 667 F.3d 835, 850 (7th Cir. 2012)

(quoting *Peirick*, 510 F.3d at 691, 689).  As a general rule, "whether individuals are

similarly situated is factual question for the jury," unless "no reasonable jury could find

that the similarly situated requirement has been satisfied."  *Eaton v. Ind. Dep't of

Corrections*, 657 F.3d 551, 558 (7th Cir. 2011) (citations omitted).   Here, a reasonable

jury could find that a male employee spraying a female employee with a water hose on

_____

[7] For the first time in its reply brief, Cambria argues that, unlike Ms. Picker, Ms. Weiler filed a
formal complaint of sexual harassment which the company was statutorily required to treat in a
different manner.  The only evidence cited by Cambria in support of this argument is a typed
statement signed by Ms. Weiler describing the incident with Mr. Stringer.  Nowhere in that
statement does Ms. Weiler refer to the incident as "sexual harassment."  Although Cambria
contends that Ms. Picker did not make a similar "formal complaint," she immediately reported
Mr. Schoonover's conduct to her supervisor who in turn reported the incident to Mr.
Quattlebaum.  It is not clear how Ms. Picker's arguably more "informal" complaint is
distinguishable from Ms. Weiler's in practice.

her backside such that her clothes were soaking wet and her underwear was visible was comparable to the seriousness of the conduct for which Mr. Stringer was terminated, to wit, an unwanted hug which was described as being given in a "joking manner" by the only third party eye witness to the incident.[8]  Thus, this issue must go to the fact finder.

For these reasons, we find that Mr. Stringer has identified a similarly situated comparator sufficient to satisfy the fourth prong of the *McDonald Douglas* test at summary judgment.  Because Mr. Stringer has presented evidence sufficient to create a genuine issue of material fact regarding whether Cambria applied its disciplinary policies in a disparate manner, our analysis of the "legitimate expectations" prong merges with the pretext inquiry in this case.  *See, e.g.*, *Smiley v. Columbia Coll. Chi.*, 714 F.3d 998, 1002 (7th Cir. 2013).

To demonstrate pretext a plaintiff must show "such weaknesses, implausibilities, inconsistencies, or contradictions in [the employer's] proffered reasons that a reasonable person could find them unworthy of credence and hence infer that [the employer] did not act for the asserted non-discriminatory reasons."  *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007) (citation omitted).

The nondiscriminatory reason Cambria has proffered here is Mr. Stringer's violation of the company's Offensive Behavior/Harassment policy.  However, Mr.

---

[8] Cambria argues that Mr. Stringer's conduct is distinguishable from Mr. Schoonover's as a matter of law because it involved physical touching.  In support of this contention, Cambria cites the Sixth Circuit's decision in *Johnson v. Interstate Brands Corp.*, 351 Fed. App'x 36 (6th Cir. 2009).  In *Johnson*, the Sixth Circuit relied on the fact that the defendant employer's past disciplinary practices made distinctions between misconduct that involved physical touching and misconduct that did not.  No similar showing has been made here.

Stringer has presented evidence that Mr. Schoonover, a similarly situated employee, engaged in comparably egregious conduct and yet was not terminated. The Seventh Circuit has recognized that "a discrimination plaintiff may employ such comparator evidence to discharge [his] burden at the pretext stage as well as to satisfy the fourth element of [his] prima facie case." *Coleman*, 667 F.3d at 853. Thus, the inconsistency in Cambria's application of its Offensive Behavior/Harassment policy creates a genuine issue of material fact as to whether its stated reason for terminating Mr. Stringer was a pretext for discrimination.[9]

This conclusion is bolstered by the fact that genuine issues of material fact also exist regarding Mr. Quattlebaum's knowledge of the note that was placed on Mr. Stringer's car stating, "fuck you, nigger" and his alleged failure to act in response to that knowledge. Viewing the facts in the light most favorable to Plaintiff as we are required

---

[9] Mr. Stringer has also adduced evidence addressing the differences in the manner that Mr. Quattlebaum investigated both incidents of misconduct that a jury could find suspect. Mr. Quattlebaum was not in the office on December 31, 2012, the date on which the interactions between Mr. Stringer and Ms. Weiler and Mr. Schoonover and Ms. Picker, respectively, occurred. Upon his return to the office on January 3, 2013, Mr. Quattlebaum collected written statements from everyone involved in Mr. Stringer's incident, including Mr. Nelson, Ms. Kamminga, Ms. Weiler, and Mr. Stringer, and also called the corporate office to report the situation. Approximately one hour later, Mr. Quattlebaum informed Mr. Stringer of his termination. Conversely, Mr. Quattlebaum did not contact the corporate office about Mr. Schoonover's behavior or respond to Mr. Stringer's emails concerning the manner in which he (Quattlebaum) wanted the disciplinary form processed. There is a genuine issue of material fact regarding whether he even spoke with Ms. Fellers, Mr. Schoonover's supervisor, about the incident upon his return to the office. Ms. Fellers contends he never spoke to her about the incident, but Mr. Quattlebaum testified that he did speak with her. Fellers Aff. ¶ 41; Quattlebaum Dep. at 76-77. However, Mr. Quattlebaum concedes that he did not conduct any investigation into the Schoonover matter and never put any documentation of the incident involving Ms. Stringer in Mr. Schoonover's file, despite the fact that reports of disciplinary action are supposed to be placed in the employee's file. Quattlebaum Dep. at 66-67, 74; Gaulke Dep. at 12.

to do at this stage in the litigation, Mr. Stringer's testimony that he told Mr. Quattlebaum about the racially hostile note that he found on his car but that Mr. Quattlebaum ignored the issue is additional evidence from which a reasonable jury could infer pretext. Although Mr. Quattlebaum denies that he was ever told about the note, resolving that dispute will require credibility determinations that cannot be made at summary judgment. Cambria argues that it does not make sense that Mr. Quattlebaum would have addressed a much less serious note, to wit, the parking lot note with "WTF" and "LOL" on it, but not investigated the more serious allegations regarding the racially hostile message Mr. Stringer received. However, again, while the jury will be free to take that argument into account in assessing credibility, the determination of whom to believe is a decision that must be made by the fact finder.

In summary, Cambria has put forth nondiscriminatory explanations both for the disparity in treatment between Mr. Stringer and Mr. Schoonover as well as its failure to act on the racially hostile note received by Mr. Stringer, to wit, that Mr. Quattlebaum was never told about the note and that he honestly believed the incident between two friendly employees that got out of hand was less serious than Mr. Stringer's interaction with a new employee with whom he had no prior friendship. Cambria will obviously be free to present these explanations to the jury at trial. However, as discussed above, determining whether these explanations ring true will require credibility determinations that cannot be

decided based solely on the parties' written submissions. Accordingly, Mr. Stringer's discriminatory termination claim survives summary judgment.[10]

### C.    Retaliation Claim

Mr. Stringer also contends that Cambria terminated him in retaliation for his alleged complaint regarding the racially offensive note left on his vehicle. To prevail on his retaliation claim, Mr. Stringer must "demonstrate that 'the desire to retaliate was the but-for cause of the challenged employment action.'" *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 881 (7th Cir. 2014) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2528 (2013)). As with discrimination, a plaintiff may establish unlawful retaliation under § 1981 using either the direct or indirect method of proof. *Humphries*, 474 F.3d at 404. Under the direct method, a plaintiff must show that (1) he engaged in statutorily protected activity; (2) he suffered a materially adverse employment action; and (3) a causal connection exists between the two. *Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th Cir. 2008). Under the direct method of proof, a plaintiff can establish a causal connection between his protected activity and termination by showing evidence of "suspicious timing, ambiguous statements oral or written, … and other bits and pieces from which an inference of [retaliatory] intent might be drawn." *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013).

---

[10] Because, for the reasons described *supra*, we find that there is sufficient evidence under the indirect method of proof to preclude summary judgment, we need not address the parties' arguments under the direct method.

To survive summary judgment using the indirect method of proof, a plaintiff must establish the first two elements of the direct test, that he was performing his job satisfactorily, and that he was treated less favorably than a similarly situated employee who did not complain of discrimination. *Ripberger*, 773 F.3d at 883. Once a plaintiff establishes a prima facie case of retaliation under the indirect method, the defendant must articulate a nondiscriminatory reason for its action; if it is able to do so, the plaintiff must demonstrate that the defendant's reason is pretextual. *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 785 (7th Cir. 2007).

The first two elements required under both the direct and indirect methods of proof, to wit, that the plaintiff engaged in statutorily protected activity and suffered a materially adverse employment action are met here. Although Cambria contends that Mr. Stringer never complained about the note to Mr. Quattlebaum or any other supervisor, that is a disputed issue of fact that must be determined by the fact finder. There is no dispute that Mr. Stringer was terminated after his alleged complaint, which qualifies as an adverse employment action.

The evidence on which Mr. Stringer relies to support his claim for retaliation is largely the same as that on which he relied to support his discriminatory termination claim. We agree, for reasons similar to those detailed above, that Mr. Stringer has presented sufficient evidence to survive summary judgment on his retaliation claim. Mr. Stringer has shown that he was terminated within two to three weeks of his alleged report to Mr. Quattlebaum regarding the racially hostile note he received; that Mr. Schoonover, a similarly situated employee who did not engage in statutorily protected activity was not

terminated; and that genuine issues of material fact exist regarding whether Mr. Quattlebaum intentionally failed to address Mr. Stringer's complaint regarding the parking lot note. If the jury believes Mr. Stringer that he complained to Mr. Quattlebaum about the note and that Mr. Quattlebaum ignored that complaint, they could reasonably infer from such behavior, coupled with the evidence that Mr. Schoonover was *not* terminated, that Mr. Quattlebaum's termination of Mr. Stringer was motivated by retaliation.

Cambria's only response is that Ms. Weiler's formal complaint about Mr. Stringer's behavior eliminates any possible causal connection between Mr. Stringer's protected activity and the termination of his employment. But, as described above, issues of genuine fact remain regarding the motivation for Mr. Stringer's termination that the jury must decide; accordingly we cannot decide Mr. Stringer's retaliation claim at summary judgment on that basis.

## III. Conclusion

For the reasons detailed above, Defendant's Motion for Summary Judgment is GRANTED IN PART as to Plaintiff's disparate pay, hostile work environment, and intentional infliction of emotional distress claims and DENIED IN PART as to Plaintiff's discriminatory termination and retaliation claims. The case will proceed accordingly.

IT IS SO ORDERED.

Date: _____03/31/2015_____

*Sarah Evans Barker*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Ryan Kenneth Gardner
ATTORNEY AT LAW
rgardnerlaw@gmail.com

Brian Lee Mosby
LITTLER MENDELSON, P.C.
bmosby@littler.com

Alan L. McLaughlin
LITTLER MENDELSON, P.C. (Indianapolis)
amclaughlin@littler.com